The next case for oral argument this morning is 25-2000, Hineman v. Chase. We'll let everybody get out. Okay, Ms. Burgundy, whenever you're ready. Good morning. Good morning, Your Honors. May it please the Court. I'd like to reserve three minutes for rebuttal, please. My name is Sarah Burgundy. I'm representing the appellant, warden, Daisy Chase, and the state of Wisconsin. And we are asking Your Honors to reverse the district court's judgment granting Jeffrey Hineman's petition for writ of habeas corpus. The question in this case is whether the Wisconsin Supreme Court unreasonably applied controlling standards in Brady v. Maryland and Turner v. United States when it held that a withheld Child Protective Services report with limited impeachment value was cumulative and not material under the following three circumstances. Its relevant impeachment information was duplicated in a disclosed police report. Its relevant information would have impeached a secondary witness's testimony about her recollection about what was in the undisclosed report, which counsel ultimately accomplished with the identical police report, the identical information in the police report, and the fact at issue whether the Child Protective Services report contained an allegation of touching by the child was peripheral, wholly undeveloped, and not advanced or argued by either side in this case. So even though the state here is the appellant, it is still Hineman's burden to show that the Wisconsin Supreme Court's decision involved an unreasonable application of United States Supreme Court standards such that no fair-minded jurists would agree with it. And beyond citing to Brady, Bagley, and Kiles, and language in those cases talking about how material requires a whole case review, Hineman does not identify any Supreme Court or even lower federal court cases demonstrating that the state Supreme Court decision here was an unreasonable application of the materiality standard. His main contention is basically that Brady, Bagley, and Kiles imposed some sort of opinion-writing requirement on courts, which this panel knows, especially NEDPA, does not. And the district court here fundamentally erred in the same way. It read the Wisconsin Supreme Court's limited writing as not engaging in a full-record analysis, and then it formulated one way it thought the nondisclosure here could have been material. But the correct approach is to consider and reject all the reasons and evidence supporting the Wisconsin Supreme Court's decision. Do you agree that they engaged in this cumulative approach to answering the materiality question? I believe they effectively considered the whole record, even though they limited it to considering the material that was in the police report and the material that was in the undisclosed child protective services report. And that was ultimately what Mr. Hyman was asking them to do. He was saying, listen, this child protective services report has a statement saying that there was no disclosure of touching. I needed that to impeach this particular witness. So I don't think it's reasonable to say, well, the Wisconsin Supreme Court should have written a lot more when Hyman directed them to those particular parts of the report. Does it matter to the analysis that it doesn't look like the lawyer ever used this information during the trial? I think if we were arguing an effective assistance for failure to properly or thoroughly impeach the witness, perhaps. But not for the cumulative? Not for the cumulative. And I think what the counsel did here was ultimately effective, and the post-conviction state court said so, where you're confronted with this witness that's insisting that there's something in a document that's not available. She was able to point out, listen, you were writing a police report saying what was in this document, and if it contained a disclosure of touching, and you're investigating a potential crime, why would that not be in your police report? It was established that whatever was in the police report, there was no disclosure of touching as of June when the police officer got the March report. But suppose for a moment you were defense counsel in this case, and at the trial you're holding in your hand a copy of the March 12th CPS report. And after you ask investigator Hintz if August was the first time SJS reported any touching, she says, I quote, I believe the March 12th CPS report indicates that SJS reported on that date that Hindman touched him. What would be your next move? Well, I think there's, well, as any performance by counsel, there's multiple things you could do. I think what counsel chose to do here was reasonable, which was to point out, again, it doesn't make sense that you have a police report talking about this Penn incident that isn't itself a crime when there was an actual allegation of touching. And so just sort of, and what counsel ended up doing is kind of making Hintz look either if she had, if there was a disclosure of touching in the March report and she hadn't put it in her report, that looks like pretty poor investigation. If there really, or if there certainly wasn't a report of it in March and she just seemed incredibly defensive and perhaps biased on the stand. As we point out in the brief, and as the post-conviction state court talked about, there was a risk in pushing this point too hard because the March report and the police report both contained a statement, allegations that the child had mimicked fellatio with a pen and at some point told his father that Hyndman had told him about it. So pushing on that point too hard could have arguably opened the door to the state bringing up, oh, are you mistaken? Are you thinking of the Penn incident and the child's telling the father about that? So the way counsel handled it, it minimized the damage to Hyndman and it did bring out that whatever was in the March report, it wasn't part of the ultimate investigation and the child's disclosure touching, which first came in August. And that's exactly what the state court found. Yes. That the strategic decision was reasonable. That was a strategic decision. And it wasn't, you know, and just to be clear, that was never raised as an ineffective assistance of counsel claim.  Yeah, yeah. And so how would she have been able to impeach if the report that would have been used to impeach Investigator Hinds, in your words, were unavailable? What more would counsel have been able to do if the case comes down to credibility? Sure. I think the only thing that counsel would have been able to do is to ask Investigator Hinds to read from her police report in the sentence saying there was no disclosure of touching. But that's not what the police report found. The police report said no specific information was given on if Hyman touched. That's the police report. And so still, if she read from her police report, counsel still would not have been able to impeach. I guess that's more of a question.  And I respectfully disagree. I think no specific information was given on if there's touching. Again, implies. And with a follow-up, there's no information in the police report that the child disclosed touching at any point before August. Well, the police report was from June. At that point, there are no details about touching. There's no Hyman touching. There's nothing in there about touching. At that point, it was simply the CPS had gotten some red flags involving this child's behavior. They weren't, you know, they were continuing, his behavior was continuing to devolve. And they sent the report to the police to just see, you know, where can you go with this? Because we weren't getting, you know, there wasn't a clear answer to what was happening. You know, I know you object to placing much of any weight on the trial court statement that he thought the verdict could go either way. It seems to me that the trial court judge was saying that small factors can make a difference in credibility determinations. And if this is true, then impeaching Inspector Hinz about her incorrect suggestion could have made a difference in the outcome, couldn't it? Well, that same court ruled that it didn't. You know, I think that's important. And it's a credibility case between the child and Hyman, not Hinz. And I think reading Hinz's testimony, I think fair-minded jurists could disagree whether her testimony was even helpful to the state in this case. It was problematic. Ultimately, if the, you know, what this court has talked about in Sims, about when impeachment evidence is material, it's strong and non-cumulative and it goes to a particularly important trial witness. Had the nondisclosed evidence gone directly to the child or directly to Hyman, if it was something like the child had made a, you know, somehow made a disclosure in May that was never turned over, or the child at some point recanted, I mean, obviously that goes to the child's credibility and that's important. Whether the jury didn't have to believe Hinz at all in this case, it was a question of whether they believed Hinz or Hyman. I'm sorry, it was a question whether they believed the child or Hyman. So, you know, this case, again, it fits way more clearly within Turner, Strickler, Socha, and not the kind of Kyle's weary Smith-Sims lines, where we have a situation where it's the, you know, state star witness, they're the only person identifying the defendant as being involved. You know, this is clearly just a, you know, it's a credibility case. And I also do want to push back on the notion that saying a case could go either way, especially a child sexual assault case, means that it was weak or that anything could have made a difference. These cases are tricky and really 97% of them don't involve physical evidence, they don't involve eyewitnesses, well, they almost never involve eyewitnesses. There's no DNA, there's typically a delayed disclosure. It really does come down to credibility and it's doesn't, it isn't a mark of a weak case. It is simply that more of the analysis and the decision-making is left to the jury and we can't know what the jury was thinking a lot of times. So, it's just harder to guess. I have about... Let's save your time. Okay, thank you. Thank you. Zelina? Thank you. Good morning. Good morning. When you strip this case down to what it was and the record, what actually happened here, the issue is straightforward. The defense was that no assault occurred. There was no contemporaneous report of assault and the accusation only developed after months of concern over the child's behavior and an investigative focus, fixation, on Jeffrey Heinemann. The state withheld evidence that directly supported that defense. It was the backbone of that defense, really, or it would have been, and the jury made its decision without that evidence. Do you agree that if we find the evidence cumulative, in other words, if we find that Hintz's June report contains essentially the same information as the March 12th report, that you can't prevail on your Brady claim? I don't believe that the March 12th report... I understand you agree that. Assume we think it's essentially the same.  Maybe not identical, but cumulative. Do you agree that you can't prevail on Brady? I believe that its effect was felt throughout many instances in the trial, the absence of that information. That information went directly to the defense, and it wasn't just impeachment. It was much more than that. To the extent the court finds that it was cumulative for purposes of impeachment of Hintz, no, I don't think that forecloses our Brady claim because it was so useful for other things in the trial, too, and it wasn't available. What I heard from Ms. Burgundy, basically, bottom line, was that this case is just about whether the jury believed Heinemann or SJS. Why don't you talk about whether it really matters to the case that SJS disclosed, or whether, I should say, I guess, whether SJS disclosed that Heinemann touched him in March or in August? It matters to the case for a number of reasons, and I think the biggest reason is that if SJS disclosed only in August, which is what happened, we know that now, then the August interview isn't corroborative of other instances where he has disclosed that information. It's not consistent with what he said. He provided contradictory testimony, and also in the interview, he didn't ever get his story straight. He didn't ever provide a clear explanation of what occurred, or what he says occurred. I disagree fundamentally with the state's characterization of Heinz as really a peripheral witness, also. I do think that that might be true at the highest level, that it was a dispute between SJS and Heinemann, and a credibility issue there. But the reality is that Investigator Heinz shaped how the jury was going to resolve that contest, because she told the jury, basically, whether or not to credit SJS's story or account of things, and I think that's consistent. What do you base that on, that she dictated to the jury, or framed it for them, when the jury heard from both the defendant and the victim here? You're right, Your Honor. It's hard to say that when you hear from the victim, who was a child at the time, that Heinz is the one controlling what the jury thinks. It seems to me that the victim, and the credibility of the victim versus the defendant, would control the jury. I think that's all important to the jury. I don't think one is necessarily controlling over the other, and I think I need to take a step back a little bit to explain why I believe that Heinz sort of controlled the narrative here. And that, I guess, goes back to what was in Heinz's report versus what was in the actual March 12th report from CPS. There's a big difference between saying that there was no disclosure of maltreatment, which is what it said in the March 12th report, and saying no specific information was given on if Heinemann touched SJS or forced SJS to touch Heinemann. To me, that infers that touching took place. It does not say the same thing at all as no disclosure of maltreatment. And so if we're looking at Heinz's report and inferring that touching happened, which I think is the only way to read that, she also connects Heinemann directly to that touching when the March 12th CPS report does no such thing. So you get that June report, and that influences her investigation. It frames, well, it puts together SJS and Heinemann in a way that the March report never did. The reality is that the March report was the best evidence, the only contemporaneous evidence that there was no disclosure of mistreatment in March or at any point before August. The CPS reports establish that. And when the allegation first emerged is central to the case. All the witnesses were saying something different, and both the child and the lead investigator here testified that there was disclosure in March or before March. The March 12th report refutes that definitively, and it was the only evidence that would refute that, and it directly, well, it's contradicted by what the investigator then put in her report. The summary just isn't the same. Without that CPS report, the defense was left litigating sort of how the state viewed the timeline here. And I also think it's important to point out, when the state was referring to the cross-examination of hints and how she could have been impeached with her report, it's important to note that, as I just said, that report implied that touching had taken place, and defense counsel knew no different, because defense counsel didn't have access to the March 12th report. Defense counsel didn't know that it said no maltreatment was reported. So it's impossible to impeach a witness with evidence that you don't know exists, and the evidence that did exist to defense counsel implied touching. So to the extent she didn't use it as fully as the courts or the state might have thought she could, I don't think that's a fair assessment, because she just didn't have it and didn't know it existed. I will also say that the report, the March 12th report, and the other CPS reports show that disclosure wasn't contemporaneous. SJS testified that he told his dad and his grandma right away when this happened in October, but the March 12th report contradicts that. On the other side, the investigator's summary of that report leaves open the possibility that that was the case. I talked at the beginning about how the report was helpful for more than just impeachment. I want to pull out the facts. One of the things that I haven't heard come out yet is that there was no more contact between the child and the petitioner after March. Included in the March report, in the March CPS report, the representation was that there was no contact, any more contact with, at least the family was not going to permit any additional contact. Did that come out? At trial, Your Honor? Because of the dates that were given as to when and how many times? I want to say that the grandmother discussed cutting off communication with Mr. Heinemann. I cannot tell you exactly when the grandmother testified that that occurred, but I know it was testified that they did cease communication because, not because of a disclosure of touching though, because even the grandmother testified that that hadn't been disclosed as of July when she was talking to the investigator. I just lost my train of thought. I'm so sorry. I'm sorry about that. That's fine. So there had been no disclosure of touching. So the grandmother's testimony about ceasing communication, what was in the reports from CPS, indicated that they ceased communication because they suspected something might be wrong. They were having behavioral issues with SJS. They thought it's the adults who were concerned. It wasn't based on a disclosure by SJS. And if defense counsel had had that March report or the other two CPS reports and the other two CPS reports, that could have been brought out also. The investigation was brought on by concerns about SJS's behavior and concerns by adults, not based on any report of touching by SJS himself. That all came out, though, during the testimony. What came out, Your Honor? I'm sorry. That the concerns came from the adults' observations of his conduct, not from a report by him. I don't know if that's the case, Your Honor. It might have come out in one instance, but then was contradicted by SJS's testimony himself when he said he disclosed it immediately. It was contradicted by Investigator Hintz's testimony that she believed that there was a disclosure in the March report because the inference then is if there was a disclosure in the March report, then it's consistent with SJS's testimony, but it's also if that was what prompted the investigation, then the investigation wasn't just based on adult concerns alone, which is inconsistent with the March report. I also want to reiterate that not having the March report influenced everything the defense was doing from the get-go, from the very beginning, including investigation that was conducted. There was no investigation into the individuals who worked. The defense lawyer didn't say that, though, did the lawyer? The defense lawyer did not testify that she didn't conduct investigation. She didn't say that not having that report impacted everything she did, did she? I think it's apparent from the record that she didn't look further into the therapist, the teacher, the other individuals mentioned in the March 12th report because she didn't know what was in the March 12th report. She didn't call any witnesses other than Heinemann. Did she know about the existence of the other reports? The existence of the April and May reports, Your Honor? Yes. I'm unsure. I'm unsure because, and I want to explain that, investigator hints, I don't even know if the investigator was aware of the April and May reports because it was only the March report that wasn't sent, or that was sent, excuse me, to the investigator in June, and that's what started the investigation. But you can see there's a big difference between an investigation being prompted by the disclosure of touching by a child and an investigation being prompted by adults who are concerned about the child but have no evidence that any sort of assault occurred. And that framed investigation because the defense attorney necessarily went into trial not knowing who was going to disclose what, what the dates of disclosure were going to be because she didn't have that information. And, in fact, she explained in closing at trial that she didn't do an opening. She waived opening twice because she didn't know who was going to testify to what, what they were going to say, what the date of disclosure was going to be, so she didn't want to predict things that she couldn't then bring out in evidence. Okay. Thank you, Ms. Lennon. Thank you. Your time is up. Ms. Burgundy, you have a little bit of rebuttal left. Great. Just in response to opposing counsel's claim that the March report and the police report were very different, the sentence in the March report is, reporter indicated that no information was given by the child that Heinemann had touched him or forced the child to touch Heinemann. The police report said no specific information was given on if Heinemann touched the child or forced the child to touch Heinemann. I don't appreciate a significant difference between those sentences such that the counsel was unable to effectively impeach Investigator Hintz. But I think what we're trying to drill home is the notion of not limiting the sentence comparison being the completion of the Brady analysis.  And so what we're looking at for purposes of habeas was the Supreme Court, Wisconsin, I'm sorry, Supreme Court sufficient in their Brady analysis? Well, and I think really the question is, is every reason that the Supreme Court's decision is supportable something that no fair-minded jurist could agree with? Is it incorrect or unreasonable? That's the question. Yes, but it still has to make it past the no fair-minded jurist standard. I think it's just better to direct answer to the question that I posed is whether or not the Brady analysis was complete. Irrespective, I think we agree on what the legal framework is, but I really am searching for an answer as to whether or not the analysis that was conducted by the Wisconsin Supreme Court sufficient for purposes of Brady answering materiality questions. If this was on direct review, it would be a sufficient analysis. I think especially in EDPA review, we have to presume that they went through a record analysis as well. I think under either case, I think even if we were reviewing this de novo, it passes scrutiny. I think Judge St. Eve in the beginning, you asked whether about the strength of the case if we think it is essentially the same question. Again, the question under EDPA, you could disagree personally with how those sentences match up or how the Supreme Court handled it. The question is would every judge agree with you on that? I think that's really the stopping point on this case. I want to just briefly talk about whether it was useful for other things at trial. Counsel has not developed that. That was not argued. To the extent she's talking about other reports, it changed the whole analysis. This really goes to a failure to investigate claim, which requires the defendant to show what the investigation would have uncovered. It can't just be, well, everything would have been different. You have to show exactly what would have been different. They've had these reports for years. They haven't done that. I see my time is up. Thank you. Thanks to both counsel. The court will take the case under advisement. We're going to take about a 10-minute break. Thank you.